Our next case for this morning is Kenneth Nelson v. Bruce Schultz, and others, and John Rogers, Mr. Nelson. Good morning. I'm Ken Nelson, and thank you for oral argument. I'd like to make five points. First, I tried to comply with the district court's order. I don't know what else I could have done. Second, the judge failed to consider proportionality an essential factor. Third, a warning that a case may be dismissed does not eliminate the requirement of proportionality. Fourth, dismissal was disproportionate to any possible prejudice to Schultz and Rogers. And fifth, my case had merit making dismissal excessively harsh. One, I tried to comply with the judge's order, and I don't know what else I could have done. I knew that dismissal would cost me millions of dollars, so I took the judge's warnings extremely seriously. I did everything I could to comply. I went to the IRS. Well, I don't think you did everything to comply. The judge pointed out what you didn't do to comply with it. What did I? Well, you tell me what you didn't do. I did not produce bank statements, but I do not have the bank statements to produce. I did not produce. Did you tell them that? Yes, I did. When? Late January, I appeared. It was the day he first dismissed. I told him that I contacted my bank. The bank said it retained statements for seven years. He almost immediately said... Well, the first time around you gave tax transcripts, which were an adequate substitute for tax returns, right? They were inadequate or adequate. That's what the judge said. I couldn't produce what I didn't have. I went to the IRS and requested the old returns, and I have subsequently gotten them. It's not my fault that the IRS takes a while to produce things. It was only some returns. There was some question about whether it was just U.S. Bank or other banks. There's a footnote in the brief saying, actually, as a matter of fact, there are other institutions. And your answers appeared, at least to the judge, to be inconsistent. You were saying repeatedly, I've produced everything you asked for, but I don't really have anything to produce. I've produced everything you asked for, but I don't really have anything. And the judge begs you to be... he says, I need a crystal clear affidavit at one point. And you didn't comply with that. I submitted many affidavits in the words of the judge. And the judge told you they aren't... you know, if you had just sort of historically said, this is what you're asking for, here are the tax returns. The tax returns themselves, by the way, not just summaries or transcripts. Apparently you didn't file tax returns for some number of years, which is a question in itself. But you were not forthcoming with either the judge or the parties on the other side about what it was that you had. And the judge, frankly, was skeptical of your statement that a person in your position doesn't keep any tax returns or bank statements. The judge was skeptical. No question. And that, I think, is the heart of this. Well, it's a credibility determination, isn't it? I was in front of him for all of two minutes or something like that. Maybe so, but it's still a credibility determination. Yes, but even suppose... well, eventually he did state in his opinion that I was not accused of destroying any documents. Right. You know, you've gone off on this foliation idea. And the judge, I think, is willing to take it for purposes of this decision that what we're looking at is carelessness or something else that doesn't meet the criteria. So you're the one who keeps introducing the notion of foliation into this case, not the judge. Yes, I did. You mentioned not filing returns. If you don't have a certain threshold of income, there's no requirement that you file a return. Nobody's ever suggested that I failed to file returns when I should have filed returns. But that was part of the problem. You go back 10 years, and there was an issue of whatever bill you had as a surety or whatever, but at least the way they're saying it, you were $15 million in the negative. And this is what would be exposed. I don't know why this took 10 years to get as far as you brought it, but it seems that if you reflect all the way back to time zero, when I guess the Kuwait group came in with all the money and got the project done, and you missed out on whatever you would call the prep stuff, whatever you did on the background. But I think you had to have a certain level of financial ability, and you couldn't show it at the time, and that's what you can't show 10 years later. No, there was no requirement that it was necessary for me to have any certain level of financial wherewithal. That's an argument that the defendants are making now, but that's an oral argument. I believe it's barred by the parole evidence rule. The judge recognized that it may be barred by the parole evidence rule. But the judge also clearly said to you that is an issue for way down the line. Discovery is liberal. Discovery is a different thing. He couldn't have been more clear. I agree. I wasn't trying. I wasn't refusing. You were kind of deciding what was relevant and what wasn't. I wasn't refusing to produce because I believed it was not relevant. I accepted his decision. What I'm saying is that the suggestion that I breached some obligation to have financial wherewithal, there was no such obligation. Okay. Well, that's what I read. That's what somebody is claiming. You say they're just wrong. Okay. But this is a problem with something that's 10 years later. There's a reason that it took so long, too. I caught the defendants with their hand in the till in 2005, and they basically said you can't touch us because if you bring suit now, it will bring down the whole house of cards. The financing will fall apart. Nobody will ever buy condos from us. In fact, Mr. Rogers invoked the doctrine of mutual assured destruction, that you cannot touch us. So, yes, I waited. But I didn't wait. I brought the suit within the statute of limitations. Right. But we'll give you that. But the fact is there was this fairly loose structure for the LLC and for the management of it, and they outvoted you. They said, look, your negative $15 million net worth is hurting our ability to get financing for the project. Now, these facts could be developed. Maybe that's right. Maybe that's wrong. But the judge decides you are not sufficiently cooperating in discovery to allow the proper development of the facts. So we're not here on the merits of what happened. We're here on did you comply with the court's discovery plan. The judge did narrow it, though, to tax returns, which I have obtained, and bank statements, which I have not obtained, but I cannot produce. You can't be punished for not producing what you can't produce. And I didn't destroy them. The most likely case is that I went paperless with my bank and never received paper returns. Did you say that in an affidavit? I did not. Why? The affidavit was simply I was supposed to set forth the steps I took to locate the documents. Well, you just told us one thing. If you said it under oath, it might have saved you in this case. It might have. But, nevertheless, even if he did. And that's what he wanted. He wanted something under oath. I'm not sure what he wanted, which is probably part of the problem here. But the question still becomes proportionality. Well, he warned you and warned you. I mean, obviously dismissal is a very significant sanction, but the Supreme Court in the National Hockey League case and other cases in this court repeatedly has said there are times when it's appropriate. It's an abuse of discretion standard. We don't like that to be the first remedy out of the box, but it certainly was not in this case. There were a number of additional chances. There were absolutely warnings. It's undisputed. He warned me many times. If you want to save a minute for your rebuttal, I'm going to advise you to do it now. I'd like to answer your question. Okay, that's fine. Giving a warning that a case can be dismissed does not eliminate the requirement of proportionality. This court in Johnson v. Chicago Board of Education and again in Svloga v. Huberman reversed dismissals where the judge had given warnings, but the judge failed to consider essential factors, basically proportionality. Well, we might get back to he asked that you should provide a crystal clear affidavit that you didn't do. I don't know what crystal clear means. You know what an affidavit is, don't you? I do, but I don't know when it's supposed to be. Did you provide that? The other side could have said this is what it needs to say, and I could have said I can say this, but not that. But they didn't want to feed you the affidavit. You needed to explain. I mean, he says produce the documents crystal clear, the actions you and your attorney took to locate. That's common sense. That's self-explanatory. I still think it does say that. All right. Well, you are out of time, so we will hear from Mr. Kurth. Good morning, Your Honors. Dan Kurth on behalf of the appellees, Bruce Schultz, and John Rogers. As you've seen from reviewing the briefs, this case really involves, we're here based on Mr. Nelson's failure to respond to our discovery requests. So I want you to talk to me about whether this dismissal order is under Rule 41B or whether it's under Rule 37B, and the different standards that apply to those two rules. They are not 100% equivalent. They aren't, Your Honor. It would be, we moved for dismissal under Rule 37B2A5. But the court then says for want of prosecution, which is not one of the 37B heads. That's correct, Your Honor. And in that respect, this falls very similar to the fact pattern that was before the court in the Orlamp opinion. And in that case, there was a question, again, by the appellant as to whether dismissal was under 37B or under Rule 41. And either way, the court went through the analysis and said it was appropriate. And we think the same thing is appropriate here. This is a case where Mr. Nelson did not give us any documents other than a few one-page tax transcripts, a partially or an incomplete 2011 tax return, a letter from one bank saying, hey, we only go back seven years and a variety of incomplete and evasive declarations, which were essentially modified or revised versions of his initial response to our request. Is that really true that banks only go back seven years? I don't know, Your Honor, but we received a letter in response to the declaration that said that. We weren't sure at the time when this was all initially briefed as to where, in fact, Mr. Nelson may have banked. What was curious is in his February 6, 2017 declaration, his final declaration, which the trial court reviewed and deemed to be, again, like his prior declarations and his prior responses, insufficient. But in that declaration, in an apparent effort to at least appear like he was trying to comply with the court's order, Mr. Nelson said, I've gone through, I believe it was, 42 drawers or 37 drawers, something like that, file cabinet drawers. He said, I've got these seven four-drawer file cabinets. I've got a desk. I've got a credenza. What he doesn't say in his declaration is how a man that keeps 37 file drawers worth of documents and is a CPA doesn't maintain any of his bank tax income financial records. But is that our issue now? I mean, the judge does not make this decision on the basis of a lack of candor with the court. He never says that. He kind of floats it out there like, boy, this is hard to believe, but then he drops it. He did say repeatedly that the responses in forms of declarations and the response to the request to produce were evasive. And under 37A.4, if a response is evasive, it's the same as being a non-response. And that is a violation of an obligation to comply with the discovery rules, and that gets us into whether a 37B.2A.5 dismissal is appropriate. So do you think, though, that failure to prosecute is the right concept for a situation where there's actually a huge amount of activity? Things are being filed, motions, whatever. It's just that they're never sufficient. It's not like he isn't doing something. Activity for the sake of accomplishment are very different things, Your Honor. And the fact that you keep repeatedly tendering declarations that say more or less the same thing of all responsive documents in my custody, possession, or control for this undefined relevant period have been produced, and that was actually amended from where they previously said are believed to have been produced, which was completely nothing, but where they say have been produced, and then it follows up with, but we aren't in the custody, possession, or control of any such documents. And it's this circular logic where you keep going back and forth, and at the end of the day, we never had any idea as to did Mr. Nelson ever have these documents. So would it have been better if, let's assume he didn't put the first sentence in there. He just started with the second sentence. You know, you've asked for X, Y, and Z, but I don't have X, Y, and Z, and here are the reasons why I don't have it. You know, my bank didn't keep the records. I'm a person who hates clutter, so I throw everything away after six months. You know, whatever he might say. If he had made responses that gave different answers, we could have addressed those at the time. Looking back on it now, what he might have said, we can't really say. What we know is this is a man that has that many file drawers worth of documents, but doesn't keep this. This is a man that said in a deposition that he knew as of 2005 at some point, there's no dispute that he was removed as a manager from the LLC in November of 2005. He subsequently gave a deposition in one of his many other cases that said, yeah, I knew as back in 2005, I had claims against these guys. Now, Mr. Nelson stated during his argument that there would have been a mutually assured destruction, and we couldn't have gotten financing, what have you. Well, the project was fully financed in, I believe, April of 2008 in terms of getting the construction loan. This is when the Arch people and everybody comes in? Arch came in, and they were an equity participant, and they were the mezzanine lender. The mezzanine lender is between sort of your equity and your construction loan, and it's sort of that quasi-hybrid high return. Anyhow, Your Honor, that was done, I believe, in April of 2008, the 30th, if I recall. There wasn't leave to... There was litigation with the next-door neighbor of the Metropolitan Water Reclamation District. There wasn't access to the site necessary for the demolition until, I believe, July of 2008. So all of this was going on long after Mr. Nelson was removed as a manager. So his arguments, which we saw in the brief in which he alluded to a little bit, an oral argument of proportionality of, you know, all of the heavy lifting is really done before I got involved. There's really not any basis for that. This was something that was very new in late 2004 and early 2005. They'd secured some rights that were dependent upon getting financing and other qualifications to actually proceed with the project. But in terms of... He was just removed, I believe, in November of 2005. There wasn't construction financing until April of 2008. There was a lot of long years in between trying to find financing and so forth. And as we indicated... Is anything else happening during this time, engineering work or some other preparatory work? There was some site work, there was some development, there was some pre-sales trying to get a qualified mass to try and show there was sufficient interest in the project to obtain construction financing. There was litigation that the MWRD filed against the project, I believe in 2006, trying to keep them from using their easement rights. All of these things were going on, and these were things that my clients were actively involved in, in which they believed they earned their development fee. This was not an issue of Mr. Nelson performing all these services for the project. And as we indicated, regardless of whether the dispute as to whether he was going to be required to personally guarantee the construction loan or not, and my clients were for $137.5 million was the loan, they had to personally guarantee that. The issue where you get to this is none of the lenders, or at least the lenders told my clients, we won't loan you $137.5 million if one of the managers that's going to have control over this money is this deep in the hole. Because the risks of him taking it and going off with it and doing something inappropriate with it were far too high for their risk tolerance. So we don't think the project ever could have moved forward with him involved in a managerial capacity. In terms of the proportionality... Can I ask you this? I mean, he has said, gee, you know, why couldn't there have been a lesser sanction? Just say you can't use any of the materials that were... or at least that he couldn't use any of the materials that were not produced. Why wouldn't that work? Well, the only one that knows whether those materials would have been helpful to him or helpful to us would be Mr. Nelson. So to the fact that he says, you know, if you find them, I'll agree you can't use them, really doesn't help us. Because to the extent that they're harmful to his position or beneficial for our position, the fact that he's going to be barred from using them at some point in the future gives us absolutely no help or assurance in our case, Your Honor. We're going in this trying to defend against claims that he waited 10 years to bring, and by waiting so long and not preserving any of his records, we're in a spot where not only can we not get them from the party that's suing us and that knew we had these claims and that had a duty to preserve these documents, but by waiting so long, he's made it so they aren't available anywhere else. The IRS says they don't have records that long. The banks, or at least the one bank he disclosed, which incidentally we found out about others, but the one bank he disclosed said we don't go back that far. What we didn't see in any of Mr. Nelson's declarations were I worked at so-and-so for this year to this year, or I didn't work during this year. I made this money or I didn't make this money. I received W-2s, 1099s, K-1s, or I didn't receive them. And if I did get any of those documents, what happened to them? Did my basement flood? Did I move them when we moved houses? What happened to them? All of these things that somebody in the position to bring a claim where you know you're seeking a share of development fees, basically earned compensation for a particular time period, you would want to be able to show what you were doing. A plaintiff has an affirmative duty to mitigate their damages once they're aware that a contract has been breached. That would be this type of documents. That's at issue here for the post-November 2005. For the pre-November 2005, it's what were you doing during the time period you were a manager and claimed you were entitled to a development fee. Were you devoting your efforts to this project or were you devoting them elsewhere? We don't know. Similarly, in terms of the finances, were we correct that what the lenders were telling us is that your finances were such an abysmal shape, we can't qualify for financing? Those are the documents that we think would justify his removal as a manager and go to whether he's entitled to any share of the development fee. If there's any other questions, I'd be happy to answer them, Your Honors. I just want to nail down one final time. Certainly. Your basic position is that the same result happens whether we see this under Rule 37B or 41B? That's correct, Your Honors. All right. Thank you very much. Thank you. You have about a minute, Mr. Nelson. I disagree with many things that were just said, but I don't have time to get into them. $1.15 million negative net worth. Nobody's mentioned it. That's a recent invention, that it was a concern of lenders. The debt was owed to my wife. Had a lender ever asked, it would have been easily explained. This talk about lenders being concerned about it, it's an invention. I don't know where it came from. There's no evidence of that. To proportionality, the absolute worst prejudice that they can suffer from not having my bank statements from 2006 to 2008 is failing to prove that I made millions of dollars of income from other projects during that period, completely mitigating my damages, and as a result, I should be barred from any recovery from 2006 to 2008. All right. Thank you very much. Thanks to both, well, thanks to Mr. Nelson and to Mr. Kurth. We'll take the case under advisement.